**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CRANSTON PRINT WORKS COMPANY, Respondent.**

No. 7576.

United States Court of Appeals Fourth Circuit.

Reargued April 21, 1958.

Decided Aug. 8, 1958.

Franklin C. Milliken, Attorney, National Labor Relations Board, Washington, D. C. (Jerome D. Fenton, General

Counsel, Thomas J. McDermott, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Frederick U. Reel, Attorney, National Labor Relations Board, Washington, D. C., on brief), for petitioner.

Kester Walton, Asheville, N. C., and Gerard D. Reilly, Washington, D. C. (Harkins, Van Winkle, Walton & Buck, Asheville, N. C., and Reilly, Wells & Rhodes, Washington, D. C., on brief), for respondent.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

HAYNSWORTH, Circuit Judge.

This is a petition to enforce an order of the National Labor Relations Board, 117 N.L.R.B. 1834, in which Cranston Print Works Company was ordered (1) to desist from conduct which the Board found to be in violation of § 8(a) (1) and (3) of the National Labor Relations Act (29 U.S.C.A. § 151 et seq.), (2) to reinstate one Hamilton, a former employee, with compensation for loss of wages, and (3) to post notices. The case presents two issues, the first of which arises out of Cranston's refusal to offer "light work" to Hamilton, who had suffered an injury to his back, and the second out of Cranston's refusal to permit Hamilton, while on leave of absence, and two union organizers having no employment relation with Cranston, to distribute literature in Cranston's parking lot.

I

On Labor Day, 1954, Hamilton sustained a back injury in an automobile collision, for which he collected damages from the operator of one of the vehicles. Because of the injury, Cranston's personnel director gave him a leave of absence of three months. He was hospitalized for only a short period, and he was able to continue his activity as the chairman of the union's negotiation committee and of its grievance committee. The contract negotiations extended through the autumn months and culminated in a written contract on December 1, 1954.

Shortly prior to the expiration of his leave of absence, Cranston's personnel director reminded Hamilton of the necessity of applying for its extension. Hamilton then applied for a three-month extension of his leave, and the extension was granted on December 3, 1954. In requesting the extension, Hamilton reported that he was then unable to do the heavy work required in his former job, but stated that if he responded to certain additional treatments, his return would be earlier than if surgery was performed.

On January 10, 1955 Hamilton saw Hardee, Cranston's personnel director, in a lunchroom and informed him that he had been released by his doctor and was ready to return to work. Hardee testified that he then told Hamilton that a medical examination and report would be required, but Hamilton denied that the subject was mentioned, and the Board believed Hamilton. On January 13, however, Hardee wrote to Hamilton:

"Early this week you advised me the Doctor had stated you were able to return to work and accordingly I refer you to Article X, Section 4 of the (collective bargaining) agreement which states:

" 'An employee who has been out because of a serious illness, accident or operation may be required, at the discretion of the Company, to successfully pass a physical examination by a reputable physician at Company expense, prior to his being reinstated.'

"We suggest that you contact the Personnel Office as soon as possible so that an appointment may be made with the Doctor for this physical examination."

Accordingly, Hamilton was examined by Cranston's regular physician, who reported to Hardee that Hamilton "should not be hired except for light work * * * No lifting."

On January 31, 1955 there was a meeting of representatives of the company and of the union's grievance committee,

Hamilton being among those present. Union spokesmen brought up the subject of Hamilton's reinstatement, claiming that Cranston's physician was, or might have been, excessively conservative in his appraisal of Hamilton's physical condition and that, under the agreement, Hamilton had the right to select the examining physician. Apparently, it was then agreed that Hamilton would be reinstated to his former position if any reputable physician of his selection, who was informed of his history, certified that he was physically fit for the job. Shortly thereafter, at Hamilton's request, Dr. Watts, the orthopedist who had been treating Hamilton and to whom Hamilton was related by marriage, wrote to Hardee that Hamilton had a herniated inter-vertebral disc but that he "has improved * * * to the point that it is felt that he might return to light work. He should avoid strenuous activity and heavy lifting for an indefinite period. Because of this, it is felt that Mr. Hamilton has a 25% permanent disability of a general nature." Subsequently the two doctors conferred, and, on February 14, 1955 Dr. Lutz, Cranston's regular physician, wrote to Hardee to say, "under no circumstances * * * should (Hamilton) be allowed to do any work that could be considered in any way arduous, or even of a moderate type of exertion."

At a second meeting between representatives of the parties, on February 10, 1955, the union representatives suggested (1) that Hamilton be reinstated, (2) that Cranston agree to arbitrate the matter,[1] (3) that Cranston agree to reinstate Hamilton in the event it was determined, in a proceeding then pending, that Hamilton was entitled to workmen's compensation benefits by reason of his disability following the automobile accident,[2] (4) that Hamilton be given "light work" and (5) that his leave of absence be further extended. None of these suggestions was accepted, the employer's position being that the medical reports showed that, because of the risk of reinjury, Hamilton was then unemployable.

At the hearing, Dr. Watts, the orthopedist who treated Hamilton and a witness for the General Counsel, testified on cross examination that he had rated Hamilton as having a 25% permanent disability of a general nature because of the possibility of recurrence of disc lesions and consequent pain and immobility. This could be brought about, he said, by any strenuous activity, bending or twisting motions, or walking, running, slipping or climbing. Upon the ground that this information was not in Cranston's possession in February 1955, this testimony was stricken. The likelihood of recurrent trouble with such conditions is common knowledge, however, and it was the stated reason for Cranston's refusal of reinstatement.

At the hearing on the complaint, it was contended that the provisions of Cranston's workmen's compensation insurance policy gave Cranston an economic interest in the return of an in-

---

1. Under the collective bargaining agreement, the union had the right to take the matter to arbitration without any such specific agreement.

2. While at work in February 1954, Hamilton strained his back. A few months later he lost about two weeks time because of his back and he received further medical treatment in July. Apparently this was treated as a compensable injury and he received compensation for his lost time and payment of his medical expense. Evidently, Hamilton was contending that his disability after the automobile injury was attributable in part to the earlier work injury and that he was entitled to the continuing benefits of workmen's compensation. The employer offered to prove a final award denying Hamilton's claim of compensation, but the motion to reopen the case and receive such proof was rejected.

Determination of Hamilton's rights to compensation, however, depending, as it did, only upon a resolution of the question of whether his disability was the result of the automobile accident or of the earlier work injury, could not resolve the question of his physical fitness for employment in January and February 1955.

jured employee to "light work" at the earliest possible moment, and that conduct inconsistent with its supposed financial interest could be explained only in terms of the alleged animosity to the individual's union activities. The Board adopted the same notion. After examining Hardee's testimony in which he stated the resumption of wage payments to a disabled employee entitled to compensation would tend to reduce Cranston's premium obligations, the Board noted that Hardee had stated that reinjury of a disabled employee returned to work, in the absence of a doctor's clearance of the employee to perform his full duties, would multiply Cranston's liabilities, but that he did not state that reinjury would occasion any such liability if there was a medical certificate that the employee was capable of performing the work actually assigned to him, that is, any "light work" for which medical approval could be obtained. The Board thus reasoned that the assignment of "light work" appropriate to a restricted medical certificate would reduce the employer's premium obligations and expose it to no risk of other liabilities. The Board's discussion of the matter is set forth in the margin, the emphasis being that of the Board.[3]

Having thus disposed of the employer's fear that risk of recurrence of Hamilton's trouble with his back exposed it to additional liabilities, the Board concluded:

"In the absence of any other plausible explanation for Respondent's discrimination against Hamilton * * * we find that Respondent's real notion * * * was to rid itself of Hamilton because of his union activities."[4]

3. "Respondent argues that the Trial Examiner ignored Hardee's testimony that it was not economical to transfer to lighter work injured employees who were not physically fit to perform their regular work and that if such employees were to suffer reinjury when utilized in other assignments, Respondent would be subjected to extraordinary liability. It was for this reason, Respondent asserts, that when a physician recommended that an employee be restricted to light work, it was Respondent's practice to lay him off, rather than transfer him to lighter work, and to reinstate him only at such time as he was physically qualified to return *to his former job*. Pursuant to this policy, Respondent contends, Hamilton was denied reinstatement because he was admittedly unable to resume the duties of his former job when he sought reinstatement early in 1955.

"While Hardee testified that when a physician restricts an employee to light work, Respondent sends him out 'until such time as he is fit and able to come back to his job,' his testimony does not substantiate Respondent's claim that it is contrary to Respondent's interests to transfer injured employees to lighter work. Hardee testified that Respondent's workmen's compensation insurance premiums are reduced by, among other things, the wages an injured employee is paid while entitled to compensation. He also testified that Respondent's liability might be multiplied were an injured employee returned to work *in the absence of a* physician's clearance to perform 'his full duties' and he received further injury. He did not claim, however, nor does it otherwise appear, that Respondent would be subjected to such a risk in the event of reinjury *if a physician had certified the employee as fit to perform the job to which he was reinstated, whether it was his former job or a different and easier one*. It would seem, therefore, that it would be to Respondent's advantage—in that it would reduce its compensation insurance premium without subjecting itself to unusual liability in the event of reinjury—to place an injured employee entitled to compensation in any job he was capable of performing, providing only that a physician had certified him as physically qualified to perform that job. We are of the opinion, therefore, that this testimony fails to substantiate Respondent's claim that it was contrary to Respondent's interest to transfer injured employees to light work. Rather, we believe, it tends to establish the contrary."

4. In an earlier proceeding, 115 N.L.R.B. 537, the Board found that Cranston had violated the Act in several respects, including a temporary layoff of Hamilton in the spring of 1954. The Trial Examiner found, and the Board seems to have approved it, that, though this earlier animosity may have waned, as evidenced by Hardee's solicitous concern for Hamilton's protection of his employee status

However warranted the Board's fault finding with Hardee's testimony, its resultant assessment of the economic interest of the employer, under the workmen's compensation laws of North Carolina, is clearly erroneous.

■ It is a general rule, in the laws applying workmen's compensation acts, that an employee who becomes disabled as the result of an accident while at work is not to be deprived of benefits because of any pre-existing infirmity. As stated by then Mr. Justice Erwin of the Supreme Court of North Carolina in Anderson v. Northwestern Motor Co., 233 N.C. 372, 64 S.E.2d 265, 267:

"While there seems to be no case on the specific point in this State, courts in other jurisdictions hold with virtual uniformity that when an employee afflicted with a pre-existing disease or infirmity suffers a personal injury by accident arising out of and in the course of his employment, and such injury materially accelerates or aggravates the pre-existing disease or infirmity and thus proximately contributes to the death or disability of the employee, the injury is compensable, even though it would not have caused death or disability to a normal person. Schneider's Workmen's Compensation (Perm.Ed.), Text Volume 6, section 1543(i); 58 Am.Jur., Workmen's Compensation, section 247; 71 C.J., Workmen's Compensation Acts, section 358."

■■ This liability of the employer cannot be waived or released or diminished by any agreement of the employee. General Statutes of North Carolina, § 97-6. If a firm and explicit agreement of the employee can provide no protection for the employer, certainly nothing that can be said by a doctor in a letter or certificate can provide the employer with such protection from liability as the Board supposed. Whether there was no medical clearance, in which event the Board recognized the risk to which the employer was exposed, or unqualified

by a timely application for an extension of his leave of absence, and the execution of a collective bargaining agreement, it was rekindled, as far as Hamilton is concerned, by the parking lot incident on January 11, 1955. This appears, it is said, from the fact, though denied by Hardee, that he did not tell Hamilton on January 10, 1955, when the two spoke at the restaurant, that a physical examination would be required, but wrote to him on January 13, 1955 that, in accordance with the collective bargaining agreement, it would be necessary. It would be most surprising if any employer of manual labor, requiring physical examinations of new employees and with the contractual right to require them of injured employees, should not have required an examination before reinstatement of an employee with such a history of back injury. Its necessity is emphasized by the fact that, on January 31, 1955, Hamilton sought to support his statement of January 10, 1955 that he had been released by his doctor and was ready to return to his old job by a certificate of a chiropractor, who, so far as appears from the record in this court, had never treated Hamilton, while the competent orthopedist who did treat him, Hamilton and the Board are all agreed that he was not able to return to his old job.

The collective bargaining agreement provides for the grant of a leave of absence, not to exceed three months in length, for ill or injured employees, and the employer is authorized to extend the leave for a period no longer than that of the initial grant. In the context of a union contract providing for the "posting" of jobs, for "bidding" and "bumping," a refusal to grant a second extension of a leave of absence, beyond the permissible maximum can hardly be the foundation of an unfair labor practice charge. We do not understand that the Board's conclusion rests upon a contrary assumption, for its finding, essentially, is that the refusal to reinstate Hamilton on January 31, 1955 was discriminatory. Its finding of a violation of the Act in the "discharge" of Hamilton when, at the expiration of his extended leave of absence, he was dropped from the payroll, appears to be a mere formalism. The record does not indicate that any one else, in like circumstances, had been granted a second extension of a leave of absence, and there is nothing to suggest that denial of a second extension of the leave of absence here was not within the discretion of the employer, if the contract did not compel it.

medical clearance, which the Board erroneously regarded as complete insulation from such liabilities, the exposure and the risk of the employer are the same. The certificate provides information and a doctor's recommendation, upon the basis of which the employer may appraise the risk of liability it assumes; but it performs no other service. The Board thus acted under a basic misconception of the law which was the predicate of its findings and conclusions.

■ The Board also found some discrimination in the treatment of Hamilton and of another employee, Goode, but this finding springs from a similar misconception of the law of North Carolina. Goode suffered a heart attack while on the picket line during a strike in the summer of 1954. As those of other replaced strikers, his name was placed upon a preferential hiring list, by agreement with the union, and he was offered, in his proper order, the first job openings. He was examined by Cranston's regular physician, who reported he should be restricted to light to moderate work in view of his earlier thrombosis, but that his former job, as described to the doctor, would be all right. A later letter, preceding Goode's reemployment, from another physician, certified that Goode was able to return to work and that his "posterior myocardial infarction" was under control. Not only did Cranston have information that Goode was substantially recovered and was reemployable, but there was the protection of the North Carolina rule that death or disability from cardiovascular infirmity is not compensable unless induced by accident or exertion beyond the ordinary incidents of the employment, a rule that does not extend to infirmities of the back. Lewter v. Abercrombie Enterprises, Inc., 240 N.C. 399, 82 S.E.2d 410.

■ So far as appears, the Board did not examine the statutes of North Carolina or the decisions of the Supreme Court of that state, but it founded its conclusions upon its assumptions of the law of that state which it made upon a critical examination of the incomplete and inexact exposition of a lay witness. The law of North Carolina, as disclosed in its statutes and decisions, is not what the Board supposed, however; far from furnishing a compelling reason to make work available for Hamilton to do, it supplies the justification for the refusal to reinstate him. Since it was the lack of apparent justification for the employer's conduct upon which the Board based its conclusion on this branch of the case, the Board's mistaken view of the law of North Carolina requires that we decline to enforce its order in respect to Hamilton's reemployment.

Everyone is now agreed that Hamilton was physically incapable of discharging the duties of his former job. Whether or not the employer had an established policy against transfers of injured employees to lighter jobs, it does not appear there was any existing job in the plant which Hamilton could do without substantial risk of aggravation of his infirmity. Reference was made to several jobs which witnesses characterized as "light work," but each required lifting or other activity which seems clearly to involve such risk. When the premise of the Board's finding of discrimination was its legal misconception of the employer's financial interest, the employer should not be required to reinstate one so seriously disabled with resultant risk of further disability of the employee and of financial liabilities of the employer.

■ The Board's resolution of issues of fact is binding upon us when its findings are "supported by substantial evidence on the record considered as a whole * * *." Section 10(e) of the Act, 29 U.S.C.A. § 160(e). When the Board's conclusionary finding is bottomed upon a preliminary finding of the legal and economic consequences of Hamilton's reinstatement, however, it cannot be said to have the support of substantial evidence if, as here, the Board was mistaken in the premise.

## II

■■ On January 11, 1955, Hamilton, then upon an extended leave of absence, together with James N. Preston, a local representative of the union, undertook to distribute literature in Cranston's parking lot. Thomas H. Cosgrove, an educational director of the union, accompanied them to take pictures of them as they made the distribution. Because of a nondiscriminatory rule, which had been impartially enforced, prohibiting such distributions in the parking lot, the guard asked them to withdraw to an area at the plant entrance, which, during its organizing campaigns, the union had freely and repeatedly used for the distribution of its literature. The three claimed they had the right to make the distribution in the parking lot, rather than in the accustomed area.[5] When they persisted in their assertion of their supposed rights and did not withdraw to the other area, they were placed under arrest for trespass. Shortly thereafter, the guard, after speaking to someone on the telephone, released Hamilton, but, a few minutes later, rearrested him. The criminal actions were subsequently dismissed with the consent of the charging party.

The Board dismissed the charges in this case insofar as they were founded upon the refusal to permit the nonemployee organizers to make distributions in the parking lot, but the employer was found guilty of an unfair labor practice for not permitting Hamilton to do so.

It is quite obvious that an employee on an extended leave of absence does not generally have the same rights of access to the employer's premises as do active employees during their hours of duty and for a reasonable time before and after. We need not now decide, however, whether such a person has the substantially unqualified right of an active employee to enter the employer's parking lot and distribute literature, Republic Aviation Corporation v. National Labor Relations Board (Le Tourneau Company of Georgia), 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372, or only the limited and conditional right of a nonemployee representative of the union, National Labor Relations Board v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L. Ed. 975, for he forfeited any special right he may have had when he accompanied the union representatives.

Preston and Cosgrove were trespassers. As the Board found, there were here no circumstances of necessity which would give them a right of access to Cranston's parking lot or deprive Cranston of its right, as to them, to enforce impartially its nondiscriminatory rule prohibiting distributions of literature in the parking lot. The Board has found that Cranston committed no unfair labor practice in stopping their distribution of literature, and it is not suggested here that their arrest was not entirely lawful. Hamilton was acting in concert with them. The three entered together upon Cranston's premises for the same purpose, which they jointly undertook to accomplish. Even active employees have no right to act in concert with trespassers or to assist others in the commission of a wrong. As said in 52 Am. Jur. 861, Trespass § 31, "It may be stated as a general rule that all persons who command, instigate, promote, encourage, advise, countenance, co-operate in, aid, or abet the commission of a trespass * * * are cotrespassers with the person committing the trespass and are liable as principals to the same extent and in the same manner as if they had performed the wrongful act themselves."

The petition for enforcement of the Board's order is denied.

5. This event occurred more than a year prior to the decision of the Supreme Court in National Labor Relations Board v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975. At that time the Board had applied the Le Tourneau rule so as to give union representatives, as well as employees, an absolute right to make such distributions in parking lots without regard to the existence of other effective means of communication. See Carolina Mills, 92 N.L.R.B. 1141.